

ORIGINAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

OCT 18 2005

CLERK, U.S. DISTRICT COURT
By _____
Deputy

NORMA MIDDLETON, Derivatively and
on Behalf of Nominal Defendant,
MANNATECH, INC.,

        Plaintiff,

v.

SAMUEL L. CASTER, TERRY L.
PERSINGER, DONALD A. BUCHHOLZ,
J. STANLEY FREDRICK, GERALD E.
GILBERT, ALAN D. KENNEDY, MARLIN
RAY ROBBINS, and PATRICIA A. WIER,

        Defendants.

and

MANNATECH, INC.,

        Nominal Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case No. _____

**8 - 0 5 C V 2 0 5 9 - K**

JURY TRIAL DEMANDED

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Norma Middleton ("Plaintiff"), derivatively and on behalf of Nominal Defendant Mannatech, Inc. by and through her undersigned attorneys, and for her Complaint against Defendants herein, alleges the following based upon personal knowledge of the Plaintiff, and on information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mannatech, Inc. (hereafter "Mannatech" or the "Company") and information readily

1

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff and shareholders of Mannatech against certain current or former officers and directors of Mannatech seeking to remedy the Defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence that occurred from August 10, 2004 through the present, (the "Relevant Period") and that have caused substantial losses to the Company. [1]

2.    Nominal Defendant Mannatech operates in the field of "glyconutrients," designing and developing proprietary nutritional supplements, topical products and weight-management products sold primarily through a network-marketing system commonly known as "multilevel marketing."

3.    Defendant Samuel Caster ("Caster") is one of Mannatech's founders and during the Relevant Period served as the Company's Chairman and Chief Executive Officer. According to a May 9, 2005, article published *by Barron's,* Defendant Caster previously headed Eagle Shield, a Texas based multilevel marketing company. According to *Barron's,* in 1988 Eagle Shield and Caster agreed to a permanent injunction concerning misleading claims made about the company's Radiant Barrier home-insulation product. Moreover, in 1991 in response to an action filed by the Texas Attorney General, Caster and his company agreed to the entry of a judgment against

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between August 10, 2004 and May 8, 2005, the Relevant Period continues through this day instead of ceasing on May 8, 2005, the day before the public became aware of the wrongdoings at the Company.

2

I \Mannatech, Inc\Pleadings\Complaint doc

them and admitted that another product, an electronic pest control device, simply did not work as represented.

4.     Mannatech products are subject to the provisions of a variety of state and federal statutes and regulations, including the Federal Food, Drug and Cosmetic Act and the Dietary Supplement Health and Education Act of 1994, which states in part that dietary supplements "may not claim to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases." 21 U.S.C. §343(r).  Mannatech acknowledges in its 2004 Form 10-K that "[a] majority of Mannatech's products are considered dietary supplements as outlined in the Federal Food, Drug and Cosmetic Act."

5.     Mannatech's multilevel marketing structure comprises purportedly independent sales associates and members.  Mannatech associates who recruit other sales associates are able to earn income from their own sales of Mannatech products and also receive a percentage of the income resulting from the sales of the associates' "downline" organization of recruits.

6.     Certain Mannatech associates operate and maintain their own websites which offer Mannatech products for sale and commonly include, among other things, articles and supportive research concerning glyconutrients, user testimonials, media reports about Mannatech and glyconutrients, links to the Company's corporate website, and information about how to become a Mannatech associate.

7.     During the Relevant Period, Defendants made materially false and misleading statements concerning the Company's business and operations. Specifically, Mannatech failed to adequately supervise and/or monitor the conduct of its associates, including those who maintain websites that prominently display misleading testimonials and/or falsely suggest that Mannatech products are effective in the

3

treatment and prevention of specific diseases including cancer, diabetes and multiple sclerosis, among others.   These false and misleading claims violate the Dietary Supplement Health and Education Act, as well as Mannatech's own Policies & Procedures for associates.

8.     Unbeknownst to public investors, the true facts, which Individual Defendants knew and/or recklessly disregarded and failed to disclose to the investing public during the Relevant Period, included: (i) that the Company's internal controls were inadequate, and failed in several key aspects, resulting in inadequate monitoring and supervision of the Company's associates; (ii) as a consequence of Defendants' failure to supervise, Mannatech associates made false and unfounded claims concerning the efficacy and health benefits of the Company's products; and (iii) as a result, Defendants' statements with respect to Mannatech's operations, performance and prospects were lacking in any reasonable basis when made.

9.     On May 9, 2005, a *Barron's* article revealed the misleading nature of the claims made on certain Mannatech associates' websites.   This news shocked the market, causing the price of Mannatech shares to plummet more than 26 percent in one day.   The next day, May 10, 2005, Mannatech shares fell an additional 19 percent as a result of this news.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

7.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

4

8.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' participation in the wrongful acts detailed herein, occurred in this district, and Mannatech maintains its corporate headquarters in this District.  Further, Defendants either reside in or maintain executive offices in this district, and/or have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

9.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.      Plaintiff, Norma Middleton, as set forth in the accompanying Verification, is, and was during the Relevant Period, a shareholder of Mannatech.   Plaintiff is a resident of the State of Georgia.

11.      Nominal Defendant Mannatech is a Texas corporation that maintains its principal place of business at 600 S. Royal Lane, Suite 200, Coppell, Texas, 75019. The Company primarily sells its products through a network-marketing system comprising independent associates and members in the United States, Canada, Australia, the United Kingdom, Japan, New Zealand and the Republic of Korea.

12.      Defendant Samuel L. Caster ("Caster") is a resident of the State of Texas. He is a co-founder of Mannatech and, at all times relevant hereto, was Chairman and Chief Executive Officer and a member of the Company's Science Committee.  Because of Caster's positions with the Company, he had access to the adverse undisclosed

5

information about Mannatech's business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith.

13.    Defendant Terry L. Persinger ("Persinger") was, at all relevant times, the Company's President and Chief Operating Officer.    Upon information and belief, Persinger is a resident of the state of Texas.

14.    Defendant Donald A Buchholz ("Buchholz") was, at all relevant times, a member of the Company's Board of Directors.  Upon information and belief, Buchholz is a resident of the State of Texas.

15.    Defendant J. Stanley Fredrick ("Fredrick") was, at all relevant times, a member of the Company's Board of Directors.  Upon information and belief, Fredrick is a resident of the State of Texas.

16.    Defendant Gerald E. Gilbert ("Gilbert") was, at all relevant times, a member of the Company's Board of Directors.  Upon information and belief, Gilbert is a resident of the Commonwealth of Virginia.

17.    Defendant Alan D. Kennedy ("Kennedy") was, at all relevant times, a member of the Company's Board of Directors.  Upon information and belief, Kennedy is a resident of the State of Florida.

18.    Defendant Marlin Ray Robbins ("Robbins") was, at all relevant times, a member of the Company's Board of Directors.  Upon information and belief, Robbins is a resident of the State of Texas.

19.    Defendant Patricia A. Wier ("Wier") was, at all relevant times, a member of the Company's Board of Directors.  Upon information and belief, Wier is a resident of the State of Illinois.

20.    Defendants Caster, Persinger, Buchholz, Fredrick, Gilbert, Kennedy, Robbins and Wier will hereinafter be referred to collectively as the "Individual Defendants").

21.    Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

22.    As officers, directors, and/or controlling person of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and traded on the Nasdaq National Market ("Nasdaq"), and governed by the provisions of the federal securities laws, Individual Defendants had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets,

7

management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

23.     Individual Defendants also participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and was aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and was aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Mannatech, Individual Defendants had access to the adverse undisclosed information about Mannatech's business operations as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Mannatech and its business issued or adopted by the Company materially false and misleading.

24.     Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period; they also were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of

8

the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

25.      Individual Defendants are also liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Mannatech's business, operations, management and the intrinsic value of Mannatech securities.

## SUBTANTIVE ALLEGATIONS

### Background

26.      Mannatech, Inc. operates in the field of "glyconutrients" and designs and develops proprietary nutritional supplements, topical products and weight-management products based on the belief that specific carbohydrates, antioxidants, and other nutrients not typically found in sufficient quantities in modern diets, are essential to maintain optimal health and wellness.  Specifically, the Company claims that eight sugar molecules play an essential role in cell-to-cell communication.  Mannatech's flagship product -- Ambrotose Complex -- is an aloe-vera-based compound, a key component in all but one of Mannatech's products, and formulated to provide the body with certain of these eight sugars. The Company states that its products "are designed to support cell-to-cell communication, the immune system, the endocrine system, healthy skin, and optimal health, as well as nutritional support during beneficial weight loss."

27.      Mannatech products are primarily sold through a network-marketing system commonly known as "multilevel marketing," comprising Mannatech's purportedly independent sales associates and members.  Thus, Mannatech associates are able to earn income from their own sales of Mannatech products and also receive a percentage

9

of the income resulting from the sales of the associates' "downline" organization of recruits.

28.     Mannatech's co-founder and CEO, Defendant Samuel Caster, is a veteran of multilevel marketing ventures.  He previously headed Eagle Shield, another Texas-based multilevel marketing company.  According to a May 9, 2005, article published by *Barron's,* in 1988 in response to an action filed by the Texas Attorney General, Caster and his company agreed to a permanent injunction concerning misleading claims made about the development of the company's home-insulation product and its ability to lower customers' utility bills; in 1991, again in response to an action filed by the Texas Attorney General, Caster admitted that another product -- an electronic pest control device -- did not work as represented.

29.     Mannatech claims to actively supervise and monitor its associates' conduct.  For example, the Company's S-1 Registration Statement, filed May 13, 1999, in connection with the Company's initial public offering, represents that the Company "take[s] an active role in the management of our associates," and claims to "seek to restrict the statements and conduct of associates regarding our business by contractually binding associates to abide by our associate policies and procedures." The Form S-1 further states that "Associates are also prohibited from creating any marketing literature that has not been approved by Mannatech or a qualified attorney. We also monitor associate websites and Internet conduct on a regular and continuing basis."  Mannatech Form S-1, filed May 13, 1999, at 47.

30.     Mannatech's Form S-1 also represents that the Company "ha[s] established, and enforce[s] as much as possible, a compliance program for disciplining associates who do not comply with our policies and procedures."  Id. at 48.  Additionally,

the Company claims to routinely monitor its associates conduct: "[O]ur compliance and legal departments, in cooperation with our other departments, regularly evaluate associate conduct and the need for new and revised rule making." *Id.*

31.     Moreover, Mannatech's 2004 Form 10-K, filed March 31, 2005 with the SEC, claims that "Mannatech takes an active role in the oversight of its independent associates," and that the Company maintains a compliance program to regulate its associates' sales activities.  Mannatech's 2004 Form 10-K describes the Company's disciplinary procedure as follows:

> Mannatech's legal/compliance program also depends on its independent associates to self-regulate by providing a standardized complaint process.  When a complaint is filed against an independent associate, Mannatech's legal/compliance department conducts an investigation of the allegations by obtaining a written response from the independent associate and witness statements, if applicable.  Depending on the nature of the violation, Mannatech may suspend and/or terminate the non-compliant associates' agreement and/or may impose various sanctions, including written warnings, probation, withholding commissions, and termination of associate status.   Mannatech's legal/compliance department, in cooperation with other departments and associates, periodically evaluates the conduct of its independent associates and the need for new and/or revised policies and procedures.   Mannatech's legal/compliance program assists in maintaining high ethical standards among its independent associates, which helps its independent associates in their sales efforts.  Mannatech also sponsors continuing education to ensure that its independent associates understand and abide by Mannatech's associate policies and procedures.

32.     In addition to a description of Mannatech's enforcement of its internal policies, the 2004 Form 10-K further states that "Mannatech has procedures in place to help ensure that its independent associates and employees comply with the requirements of DSHEA [the Dietary Supplement Health and Education Act of 1994], the Food, Drug and Cosmetic Act, and various other regulations."

33.     Mannatech also assists its associates with personalized website development, and provides Company-approved advertisements and sales materials for associates use.  In fact, the Company's Code of Ethics states that associates are strictly prohibited from using sales materials which are not Company-approved, with violations of this policy subject to the Company's "Compliance Disciplinary Procedure."

34.     Despite these asserted policies and procedures, Mannatech associate websites include testimonials and claims that allude to the Company and its products, by linking the use of glyconutrients with the prevention, treatment and cure of various diseases and afflictions including, but not limited to, cancer, diabetes, arthritis, asthma, hypertension, cerebral palsy, cystic fibrosis, multiple sclerosis, Tay-Sachs Disease, Down syndrome and hepatitis.

35.     For example, a website maintained by Mannatech associate Jenerik Enterprises displays a magazine article titled "Back from the Brink," published in the April 21, 2001, *Las Vegas Review-Journal*.  The article describes the experience of Greg Letourneau, identified on the website as a 44-year-old man diagnosed with Toxic Shock Syndrome who was near death until his doctors administered glyconutrients. The article describes Letourneau's illness and subsequent "remarkable" recovery, stating in part as follows:

> The illness is caused by the same bacteria that causes strep throat.  If a strep infection isn't treated in a timely fashion, it can, as in Letourneau's case, infect the blood causing TSS.
>
> A little more than a day after being admitted to the hospital, Letourneau's arms and legs were blue and cold and had no pulses, which meant they weren't receiving blood flow.
>
> Schlachter worked to keep Letourneau alive as his temperature soared to 107 degrees and his blood pressure plummeted to dangerously low readings.



"In my experience, when patients get to that point they don't survive," Schlachter said.  "I looked at all the evidence and said, "This patient is going to die."  There was basically no hope.  He was maxed out on every med we could give him."

Stenberg sat by her brother's side through the whole ordeal waiting for doctors to help him.  But nine other doctors consulted with Schlachter and all gave up hope for his recovery.

"The doctor came in and said, "If you've got family you'd better get them," Stenberg said, fresh tears running down her face.  Stenberg called a priest to give her brother last rites.  "Ten doctors came to me and said he was going to die.  I said, "He can't die, he's only 44.  Please do something."

Luckily, Schlachter had an ace up his sleeve, something he could try but not make any promises about: glyconutrition.

Six hours after administering the first dose of glyconutrition, the color began to return to Letourneau's limbs.  It was several days before his life was out of danger and seven weeks before he was released from the hospital, but his recovery has amazed Schlachter, who plans to write a journal article about the case.

"I've never seen it before, let alone heard of it," Schlachter said.  "The whole thing is remarkable."

Looking at Letorneau now, with his athletic frame, tanned skin and overall appearance of good health and vitality, it's hard to believe he was all but dead six months ago.

\* \* \*

36.    Another Mannatech associate website, GlycoStory.com, also displays Letourneau's story as well as an audio link to another testimonial concerning a lifelong allergy suffer who was "essentially allergy free" after only three months of glyconutrient therapy.  Although Mannatech products are not mentioned by name on the GlycoStory website, the website's "Products" link sends online visitors to GlycoScience.org, a website maintained by Nominal Defendant Mannatech.

13

37.     Similarly, the website for GlycoLife Neutraceuticals offers only Mannatech products for sale and provides testimonials concerning sufferers of cancer, multiple sclerosis and other debilitating and potentially life-threatening diseases purportedly remedied through glyconutrient use.   The GlycoLife Neutraceuticals website also provides links to Mannatech's *GlycoScience.org* website and to *GlycoStory.com.*   The following testimonials appearing on the GlycoLife Neutraceuticals[2] website also appear in various forms on other Mannatech associates' websites, featuring these same patients:

Michelle Desrochers

Two years ago Michelle was a typical 10-year-old child with Down syndrome, attention deficit, always sick and hospitalized many times due to severe asthma attacks.  Her life consisted of the nebulizer, antibiotics and steroids.  That daily medical regime is no longer a part of her life since her parents, Barbara and Jacques, began giving her the glyconutritional product from Mannatech....

Today, Michelle is a typical "middle school pre-teen."  She participates in P.E. (even on windy, hi-pollen days), is an honor student, and hasn't had an asthma attack for over a year and a half.

**"[W]e and others have noticed that the facial features associated with Down syndrome have become less pronounced, a side benefit we didn't expect."**

Garleen Cooper

Cancer took the lives of her loved ones, and it seemed as if Garleen's skin cancer was going to kill her too.  A picture is worth a thousand words when you see how Glyconutrients gave this woman her life back.  The skin cancer has disappeared and Garleen's self image has improved at least a million percent!   **Everyone can benefit from this breakthrough technology.  Start today and plan to be healthy for life!**

Jaclyn

---

[2] www.glycolife.com

I \Mannatech, Inc\Pleadings\Complaint doc



Shortly after being married, Jaclyn was faced with the greatest challenge of her life. The excitement of being a newlywed was soon drowned out by the confinement to a wheelchair. Jaclyn's [Multiple Sclerosis] had beaten her, at least for the time being. A friend introduced her to Glyconutrients, so Jaclyn agreed to give them a try. To everyone's amazement, Jaclyn became the fastest response to Glyconutrients of anyone who has tried them with MS. The restoration of health usually takes several months with such a debilitating condition. **For Jaclyn, within two weeks she was walking again.** Truly a miracle!

[Emphasis added.]

**False And Misleading Statements**

38.    On August 10, 2004, Mannatech issued a press release announcing the

Company's financial results for the second quarter ended June 30, 2004. The press

release, titled "Mannatech Announces Record Quarterly Sales, Net Income and E.P.S.,"

stated, in pertinent part, as follows:

COPPELL, Texas -- (BUSINESS WIRE) - August 10, 2004 Mannatech, Incorporated (Nasdaq:MTEX) today announced record sales and net income for its second quarter ended June 30, 2004. For the three months ended June 30, 2004, net sales reached $74.3 million, which was an increase of 59.8% from $46.5 million for the same period in 2003 and net income increased by 376.1% to $5.6 million or $0.20 earnings per share (diluted), as compared to $1.2 million or $0.04 earnings per share (diluted) for the same period in 2003. For the first six months of 2004, net sales increased by 52.5% to reach $132.7 million and net income increased to $8.7 million, or $0.32 earnings per share (diluted), compared to sales of $87.0 million and net income of $2.6 million, or $0.10 earnings per share (diluted) for the same period in 2003....

Commenting on the results, Mannatech Chairman and CEO Sam Caster said, "Our record performance, with sales growth of 59.8% and net income increasing 376.1%, is a testament to Mannatech's products, our Associates and the future of the Company. Along with this tremendous growth in our current markets, we are excited about introducing Mannatech products to South Korea when we plan to open for business in September 2004. Another sign of our strong trend is our increase in pack sales, which increased by 101.8% in the second quarter of 2004 as compared to 2003. Pack sales, which are regarded as a leading indicator for Mannatech, include signups, renewals, and upgrades, and our higher priced pack choices include various product selections as well as sales materials. New Associates are

joining our company at a record rate, and we look forward to adding South Korea to our family of markets."

39.    That same day, August 10, 2004, Mannatech's financial results for the second quarter of 2004, the period ending June 30, 2004, were repeated in the Company's Form 10-Q filed with the SEC and signed by Defendant Caster.

40.    On November 9, 2004, Mannatech issued a press release announcing the Company's financial results for the third quarter ended September 30, 2004.  The press release, titled "Mannatech, Inc. Announces Record Quarterly Sales & Earnings," stated, in pertinent part, as follows:

COPPELL, Texas--(BUSINESS WIRE) Nov. 9, 2004

Mannatech, Incorporated (Nasdaq:MTEX) today announced record sales and earnings for its third quarter ended September 30, 2004 as compared to the same period in 2003.  For the three month period ended September 30, 2004, sales reached $77.6 million, a new quarterly sales record for Mannatech, which was an increase of $27.8 million, or 56.1%, as compared to the prior year.  Net income rose to $6.8 million, which more than doubled versus the same period in 2003.   Net income as a percentage of net sales increased to 8.8% of net sales as compared to 5.8% for the same period in 2003.  Earnings per share (diluted) for the third quarter of 2004 increased to $0.25 per share, which was an increase of 127.3% as compared to the prior year.

Sales for the nine months ended September 30, 2004 were $210.2 million, up 53.8% versus 2003.  Net Income reached $15.5 million, which was an increase of $10.0 million or 183.4% over last year, while earnings per share (diluted) for the nine months ended September 30, 2004 was $0.57, again of 171.4% as compared to the same period in 2003.

The third quarter results represented a new quarterly record and marks Mannatech's eighth consecutive quarter of successive sales increases, during which time sales have more than doubled....

* * *

Sam Caster, Chairman and CEO of Mannatech, commented on the records setting results.  "We have seen our business grow rapidly and successfully for the past eight quarters, through the tremendous labors of our Associates around the world in concert with the highly focused and

16

I \Mannatech, Inc\Pleadings\Complaint doc

motivated activities of our corporate staff. We have also seen our sales double since the string of successive quarterly increases began in the fourth quarter of 2002. This strong trend is rewarding to us, and yet we believe that we have just begun to realize the potential of the products Mannatech brings to the world. We intend to continue our growth into new markets around the globe, and we welcome into the Mannatech family the Associates in our newest market in South Korea, which opened in September, 2004."

41.     That same day, November 9, 2004, Mannatech's financial results for the third quarter of 2004, the period ending September 30, 2004, were repeated in the Company's Form 10-Q filed with the SEC and signed by Defendant Caster.

42.     On March 9, 2005, Mannatech issued a press release announcing the Company's financial results for fourth-quarter and full-year 2004. The press release, titled "Mannatech Inc. Announces Another Record-Breaking Year of Annual Sales & Profit" stated in pertinent part as follows:

MANNATECH INC. ANNOUNCES ANOTHER RECORD BREAKING YEAR OF ANNUAL SALES & PROFIT

COPPELL, Texas--(BUSINESS WIRE)--March 9, 2005

Mannatech, Incorporated (Nasdaq:MTEX) today announced the achievement of new annual sales and profit records for 2004. Consolidated net sales reached a new high of $294.5 million, an increase of $103.5 million, or 54.2%, as compared to 2003. Mannatech's net income of $19.6 million more than doubled as compared to the prior year with an increase of $10.8 million, or 122.4%, and earnings per share of $0.71 (diluted) increased 108.8% as compared to 2003....

* * *

Fourth quarter results also included a new consolidated net sales record of $84.2 million for Mannatech, which was an increase of $29.9 million, or 55.1%, as compared to the same period in 2003. Fourth quarter net income was $4.0 million, or $0.15 earnings per share (diluted), which was an increase of 21.9 % over the fourth quarter of 2003. Net income for the fourth quarter included one-time non-cash charge, totaling $3.0 million, or $0.07 per diluted share, net of tax, related to Mr. Caster's sale of 180,000 shares of his common stock to a former employee, Dr. H. Reginald

17

McDaniel.  The sale was for a price that was below the fair market value *of* Mannatech's stock on the date of the sale....

\* \* \*

Mr. Caster commented on the new all time high record sales volumes for the periods, stating, "We are extremely pleased with the financial gains and continued strength shown throughout 2004, and also are delighted with the impressive sales momentum generated by our 369,000 current independent Associates and members around the world.   Our groundbreaking glyconutritional technology continues to bring hope, health, and opportunity to people in record numbers and we believe that we are just scratching the surface of the potential of Mannatech."

43.    On March 31, 2005, Mannatech filed its annual report with the SEC on Form 10-K for the period ended December 31, 2004.   The 10-K was signed by Defendant Caster, among others, and reaffirmed the Company's previously announced financial results.

44.    Individual    Defendants' knew or recklessly disregarded that their statements described in ¶¶39-43, above, were materially false and misleading when made because they misrepresented and/or failed to disclose material adverse facts about Mannatech: Unbeknownst to public investors, the true facts, which Individual Defendants knew and/or recklessly disregarded and failed to disclose to the investing public during the Relevant Period, included: (i) that the Company's internal controls were inadequate, and failed in several key aspects, resulting in inadequate monitoring and supervision of the Company's associates; (ii) as a consequence of Individual Defendants' failure to supervise, certain of the Company's associates made false and unfounded claims concerning the efficacy and health benefits of Mannatech products; and (iii) as a result, Individual Defendants' statements with respect to Mannatech's operations, performance and prospects were lacking in any reasonable basis when made.

**Disclosures at the End of the Relevant Period**

45.    On May 9, 2005, an article published by *Barron's* described the
Company's business operations, as well as the therapeutic claims made on certain
Mannatech associates' websites for a variety of diseases, including cancer, arthritis,
diabetes, cystic fibrosis and other diseases.    The article, titled "Manna from Texas,"
referred to some of the same testimonials described in paragraphs 35-37 above, and
stated the following:

Manna From Texas

By RHONDA BRAMMER

IN TEXAS, EVEN SMALL-CAPS have 10-gallon ambitions.  A case very much
in point: Mannatech.  A relatively new company that went public six years ago,
it operates in a kind of tributary -- backwater might be even more apt -- of the
health-care industry.   Yet while it may be obscure -- not a single analyst
follows it -- the company boasts a solid balance sheet and soaring earnings,
enjoys high returns on capital and throws off slugs of cash.    Lucky
shareholders certainly have no complaint: Its stock has rocketed from under
$2 in 2003 to a recent high of $26.  At Friday's close of $20 and change, the
company sports a stock-market value of $550 million.

Already growing at a blistering pace -- sales last year hit $295 million, up from
$191 million the year before and $141 million in '02 -- the company, from its
base in Coppell, Texas, is busily stepping up expansion of its budding empire,
not only in the U.S., but in foreign markets, as well.  Some 35% of revenues
last year came from operations in Australia, Japan, Canada, New Zealand
and the U.K.  In September, Mannatech branched out into Korea, and it will
enter Taiwan next month.

The fuel for Mannatech's explosive growth is no high-tech breakthrough or
merchandising innovation, but, rather, a line of nutritional supplements, called
glyconutrients.   These supplements supply carbohydrates, or sugars, the
company claims are necessary for optimal health and not found in adequate
amounts in modern diets.   Mannatech also offers skin-care and weight-
management products.

Most Mannatech products include Ambrotose Complex.

19

Last year Mannatech earned $19.6 million, or 71 cents a share, more than twice the 34 cents it netted in 2003. Book value weighs in at only about $2 a share, but some $1.60 of it is cash, and the company has barely a speck of long-term debt.

Because Mannatech outsources the manufacturing of its supplements, it can sharply boost sales with little or no investment simply by adding more sales people, virtually all of them independent contractors. Which is why it enjoys truly outsize returns on capital: In 2004, return on equity came in at a formidable 44%.

**But for all the surface flash, eye-popping financials and grand plans, Mannatech's allure steadily dims the more intensely one scrutinizes its provenance and how it makes its living.**

**More specifically, our skepticism grew as we examined the company's multilevel marketing structure, reviewed some of the extravagant claims of its sales people both here and abroad, and perused the complaints of the Texas attorney general's office about an earlier venture of Mannatech's chief exec, Samuel Caster.**

A lot of the concerns sparked by our research into the company and its affairs find dramatic expression in a civil suit, filed in Los Angeles Superior Court, charging Mannatech and Caster with, among other things, "negligent misrepresentation" and "conspiracy to commit fraud," The company, let us hasten to add, denies all the allegations in that case and avers it deals severely with any misconduct by its sales associates.

Mannatech went public in February 1999 at $8. In the first days of trading, the stock ran wild, hitting an intraday high of $44.50. From there on, however, it was virtually all downhill. By May `01, shares were trading under $1, and for the next two years, they never got above $4 and change.

From the get-go, Mannatech's strategy has been two-pronged: to develop a proprietary line of supplements and a multilevel marketing organization to sell them. The hallmark of its multilevel marketing is that salespeople, called "associates," earn money not only by selling supplements, but also by recruiting other associates to sell supplements, who, in turn, are encouraged to recruit still more salespeople. In this fashion, the original associate builds what is called a downline network and, importantly, gets a financial cut from not only his own sales, but the sales of his entire network.

This is not Caster's first multilevel marketing venture. In the late 1980s, he headed up just such an enterprise, Eagle Shield, that was the source of

run-ins with the consumer-protection division of the Texas attorney general's office.

Eagle Shield's initial product -- based, the company claimed, on a new technology invented by the National Aeronautics and Space Administration -- was insulation for homes that bore the label Radiant Barrier and could, the company boasted, slash a consumer's utility bills by 18% to 40%.

In sharp disagreement, the attorney general's office maintained that the technology long predated NASA -- in fact, had been around since the 1940s -- and didn't work as advertised. In August 1988, Eagle Shield and Caster agreed, without admitting or denying wrongdoing, to a permanent injunction requiring them to prominently disclose they had no ties to NASA and to not claim Radiant Barrier cut utility bills by more than 3% to 8%.

In January 1991, the Texas AG's office was again stirred to action. This time the focus of its displeasure was the ElectroCat, a device that emitted "pulsed" vibrations and could, according to the company, rid farms and homes "of roaches, spiders, crickets, fleas, ticks, ants, mice, rats, gophers, moles, snakes and scorpions."

Baloney, said the attorney general's office, noting that the ElectroCat emitted "no measurable vibrations, pulsed or otherwise," and had no measurable effect on mice or bugs. "The device is a hoax," the AG declared, "and stands on the same scientific footing as a perpetual motion machine."

On Jan. 24, 1991, Caster and his multilevel marketing company agreed to the entry of a judgment against them and admitted that the ElectroCat, flat out, didn't work.

Asked about his difficulties with the Texas attorney general, Caster is philosophical. "It taught us how to appropriately validate claims," he responds, "It was a very good lesson in life."

Undaunted, Caster tried again and hit it big with Mannatech. Not the least of reasons for its success is that a whopping amount of Mannatech's business gets done over the Internet. Associates can both sell supplements and sign up recruits on-line. Going into biz takes nothing more than a home computer on the kitchen table. Importantly, Mannatech helps associates design Websites and offers to ship supplements directly to customers, all the while keeping track of an associate's commissions. What's more, an associate can monitor his whole downline network -- see who's drumming up business and who's not -- via computer.

The company's stock-in-trade supplements, often referred to by associates simply as glyconutrients, are based on something called Ambrotose

Complex. Ambrotose is a proprietary blend of Manapol, a substance derived from the aloe-vera plant, and other glyconutrients, which Mannatech contends support the immune system, the endocrine system and cell-to-cell communication. Ambrotose Complex is a key component in all but one of Mannatech's line of 30 products.

The ingredients in Ambrotose Complex are arabinogalactan (larix decidua gum), gum ghatti, gum tragacanth and, notably, Manapol aloe-vera gel extract (inner-leaf gel).

The last-named ingredient, Manapol, is sold exclusively by Irving, Texas-based Carrington Labs (CARN), a company whose research for more than two decades has focused on the aloe vera plant. During that long span, as Barron's readers may well recall, Carrington has touted its aloe-based drugs as a cure for everything from cancer and AIDS to ulcerative colitis.

The gyrations in Carrington's stock have been spectacular -- in 1989-90, it bounced from $12 to $41 to $4; in `96, from $30 to $50 to $7. But, alas, Carrington's drugs, for all the induced bouts of speculative fever, were total duds as a treatment for AIDS, cancer or even colitis.

In only two of the past 10 years has Carrington been even marginally profitable. Its shares now fetch about $4, and arguably its most successful product is the aloe-based Manapol it supplies to Mannatech, which last year chipped in 47% of Carrington's sales.

The Carrington connection, however, goes beyond that of buyer-supplier. Some of Carrington's key scientists and execs have signed on with Mannatech and reaped very handsome rewards.

Eileen Vennum, who from 1988 to '96 was Carrington's director of regulatory affairs, is today a senior vice president of R&D at Mannatech. Bill McAnalley, who from '87 to '95 was a V.P. of R&D at Carrington, is today Mannatech's chief science officer.

Reginald McDaniel, who as a consultant did studies on aloe-based compounds for Carrington, served as Mannatech's medical director from `96 to `02. After Mannatech's IPO, he owned more than 500,000 shares, which today would be worth $10 million.

Last December, when Mannatech shares were trading around $20, McDaniel -- no longer on the payroll -- was allowed to buy 180,000 shares directly from chief exec Sam Caster at $2.66 a share. On paper, it was a tidy $3 million bequest. The sale, says Caster, was to enable McDaniel to "pursue his ongoing passion for the research of glyconutrients."

An upbeat Texan with a bit of drawl, the 54-year-old Caster credits McAnalley and McDaniel with having "pioneered the science of glycomics."

"Glyco" is the Greek word for sugar, he explains, not the sweet kind, sucrose, but rather sugars that come from plants, like mannose from the aloe vera. With its "significant patents," Mannatech is on the forefront of a "brand new area of nutrition," Caster insists. But while Mannatech does have some foreign patents, in the U.S., according to the 10-K, it "continues to face the risk of its patent protection for Ambrotose complex being ultimately denied."

Unlike Carrington, which wanted to market its products as drugs and suffered devastating rebuffs by the Food and Drug Administration, **Mannatech is selling Ambrotose only as a food supplement and so needs no blessing from regulators. However, the company is strictly prohibited from claiming Ambrotose "treats" or "cures" anything. Moreover, the Federal Trade Commission requires Mannatech to have "adequate substantiation" for its claims, meaning they must be based on "competent and reliable scientific evidence."**

**Associates receive clear guidelines about what they can claim, Caster asserts, and the company disciplines or dismisses those who break the rules.**

**Yet even the most cursory visit to the Websites of Mannatech associates reveals that these sites are replete with the most astonishing of claims. For example, one such Website, with no readily visible disclaimer, tells with graphic visuals and somewhat primitive prose the remarkable story of Jaclyn, a young woman suffering from multiple sclerosis. She is shown first sitting in a wheelchair and then, in a second photo, working out on a treadmill.**

The text accompanying those starkly contrasting photos reads: "Shortly after being married, Jaclyn was faced with the greatest challenge of her life. The excitement of being a newlywed was soon drowned out by the confinement to a wheelchair....A friend introduced her to glyconutrients....To everyone's amazement, Jaclyn became the fastest response to glyconutrients of anyone who has tried them with MS. The restoration of health usually takes several months with such a debilitating condition. For Jaclyn, within two weeks she was walking again.

Or jump to another Website and learn about Rikkea, born with cerebral palsy. The pitch comes presumably from her parents: Our six-year-old daughter Rikkea could not walk or speak at the age of two due to brain damage caused by cerebral palsy....She was having seizures, constant drooling from the mouth.... We were introduced to and gave her two capsules of glyconutrients a day in December 1998. After only one week,

23

she got up and walked around the house!!  She soon began speaking clearly in sentences too!!"

**Close inspection of this site turns up a disclaimer, in small print, to the effect that the statements made have not been evaluated by the FDA and that Mannatech products are dietary supplements not intended to treat disease.  But perhaps worth noting, this demur comes after pages and pages of testimonials about the remarkable effects of glyconutrients on a vast array of diseases, including arthritis, hepatitis, brain cancer, diabetes, subglottic hemangioma, prostate cancer and toxic-shock syndrome.**

Here, as on a good many other associates' sites, people also can get info on the "amazing opportunity" to sell Mannatech's supplements.  Such sites do double duty, by both selling the products and also recruiting foot soldiers for Mannatech's sales force.

The promotional spiel on this associate's site begins: "Think about this.  If there is a product that could benefit every person on earth, is scientifically validated, is new, is essential like vitamins, is patented, and is only available from ONE company that has an upward business growth compared to that of Microsoft, that equates to a very significant opportunity."  Bill Gates, are you listening?

**In spite of flagrant flouting of the rules by salespeople, Mannatech maintains that it complies with applicable laws and regulations, Caster makes a sharp distinction between the company and its associates, conceding that from time to time the latter may make improper claims.  "We're enforcing our policies," he insists, "but there's only so much we can do."**

The seemingly irrepressible inclination of some Mannatech associates to make extraordinary therapeutic claims for the supplements has irked some foreign regulators.  In New Zealand, the Medical Devices Safety Authority notified Mannatech that its salespeople were making unwarranted claims after newspaper articles in early 2003 described how Stephen Nugent, a Mannatech employee with Ph.D.s in psychology and "naturopathic medicine," had extolled the virtues of the supplements before packed crowds in several cities.

Speaking to some 500 people in an Auckland ballroom, Nugent is reported to have referred repeatedly to breast and child cancer, cited medical studies supporting the company's theories and implied he could be more specific except for fear of running afoul of the government and its regulatory bodies

24

In addition, the New Zealand Press Association reported that Mannatech associates were allegedly claiming the supplements could treat HIV, cancer, cystic fibrosis, arthritis and Down syndrome.

Mannatech addressed the complaints from the New Zealand Medical Devices Safety Authority through its in-house "disciplinary procedure" and, as of last June, according to the 10-K, had satisfied the regulators.

In Australia, the Therapeutic Goods Administration continues to monitor the company and has required Mannatech to provide "compliance training" for associates for the next three years.

Symptomatic of what may have prompted such oversight were some dubious practices by a Mannatech associate, whose medical license was cancelled for two years in 2000 by the Australian Health Practitioner's Tribunal.  According to the tribunal's report of its disciplinary action, the doctor, Ian Raddatz, who together with his wife had a sideline business selling Mannatech products, had told patients that the supplements could treat infertility, brain damage and cancer; had urged patients to use Mannatech supplements instead of their prescribed medications, and had tried to recruit a cancer patient's daughter as an associate, telling her: "These wonderful pills will...work wonders on your mother's cancer."

Even more egregious are the allegations at the heart of a lawsuit filed Nov. 1, 2004, in a Los Angeles Superior Court by Chie Sasaki, mother of a child with Tay-Sachs disease.  She accuses a Mannatech associate, Caster and Mannatech itself of, among other things, intentional infliction of emotional distress, negligent misrepresentation and conspiracy to commit fraud.

The charges stem from the alleged actions of a Mannatech associate and Sherman Oaks chiropractor, Victoria Arcadi, who treated Sasaki's son, Yasuhiro, after he was diagnosed with Tay-Sachs, a fatal ailment most common among Ashkenazi Jews.  Arcadi has denied all the charges against her.

According to court papers, after an initial chiropractic exam in September 1996, Arcadi recommended that Sasaki's son, then three years and nine months old, be given Mannatech supplements.  His mother added them to a complicated diet she was already feeding him based on a high-calorie soy-based formula. By being fed nine times a day, the boy managed to gain several pounds.

His mother subsequently gave Arcadi pictures of the boy to show his weight gain, solely for the purpose of his treatment and expecting them to be kept confidential.  Yet without oral or written consent, the complaint continues, in May 1997 Arcadi showed photographs of a naked Yasuhiro to several hundred people at a Mannatech demonstration seminar.

25

A month later, when Yasuhiro's mother discovered her son's photos were being widely used at Mannatech sales meetings, she fired off a letter of protest directly to Samuel Caster, then Mannatech's president. According to the complaint, Mannatech and Caster denied responsibility.

In July 1997, the complaint continues, Yasuhiro's mother protested, on three separate occasions, to Arcadi, who, promised to protect Yasuhiro's privacy but did not return the photographs as requested.

A month later, Arcadi co-authored an article entitled "Case Study: Tay-Sachs Disease Improvement During Nutritional Supplementation" in the Journal of the American Nutraceutical Association, featuring Yasuhiro Sasaki and describing his dramatic improvement taking Mannatech supplements. Thanks apparently to the supplements, the authors reported, "the child is interacting with his environment and exhibiting physical and vocal communication."

Yet, according to the complaint, when the article was published in August 1997, Yasuhiro Sasaki was already dead.

After his death, his mother again demanded Mannatech, Caster and Arcadi stop using her son's likeness and story in marketing Mannatech products, and, according to the complaint, she was led to believe the objectionable distribution would stop.

But years later -- in March 2004, to be precise -- she received an e-mail from a woman in Mexico whose nephew was afflicted with Tay-Sachs. The woman had seen photographs depicting Yasuhiro's purported improvement using Mannatech products on a current Website, "with the clear inference," according to the complaint, "that Yasuhiro was alive and doing well some seven years after his actual death."

**Caster adamantly denies that he or Mannatech had anything to do with distributing Yasuhiro's story or his photographs. "As a company, we never used the pictures," he stresses. But he concedes that some associates might still be using Yasuhiro's story and photos. "Once they get out there," he observes, "it's impossible to get them back."**

So far, anyway, neither regulatory disapproval abroad nor wildly hyperbolic claims by associates on their Websites here have dampened the ardor of Mannatech users and associates (who often overlap) or slowed the company's vigorous growth.

And shareholders, as noted, have little reason to be displeased. Especially those shareholders who happen to be insiders. In the past 12 months,

26

seven Mannatech insiders have sold more than 900,000 shares worth $18 million,

Two of the biggest sellers were Eileen Vennum and Bill McAnalley. Specifically, in just the past six months, Vennum sold over 85,000 shares worth more than $1.8 million; McAnalley sold 259,000 shares worth a cool $5.5 million.

Vennum is senior vice president of R&D at Mannatech. McAnalley is chief science officer, the company's R&D honcho. They are, pure and simple, Mannatech's top scientists, both named as inventors on a U.S. patent that is pending for Ambrotose Complex.

Nothing amiss in their selling stock, of course. But to a cynical eye, that they have sold in such quantity could easily be taken as hedging their bets.

[Emphasis added.]

46.      The *Barron's* article shocked the market. The disclosure of the unfounded and unsubstantiated claims made by Mannatech associates about the health benefits of the Company's products caused Mannatech shares to plummet more than 26% in one day, to close at $15.11 per share on May 9, 2005, the same day that the *Barron's* article appeared. The following day, Mannatech shares fell another 19.59%, to close on May 10, 2005 at $12.15 per share.

**Individual Defendants' Illegal Insider Stock Sales**

47.      During the Relevant Period, Defendants Caster, Persinger, Stanley, Gilbert, and Kennedy sold 655,586 Mannatech shares for proceeds of $7,707,211.84.

48.      During the Relevant Period Defendant Caster sold 180,000 Mannatech shares for proceeds of $478,800.00.

49.      During the Relevant Period Defendant Persinger sold 180,100 Mannatech shares for proceeds of $2,911,282.00.

27

50.     During the Relevant Period Defendant Stanley sold 273,652 Mannatech shares for proceeds of $3,874,282.31.

51.     During the Relevant Period Defendant Gilbert sold 20,334 Mannatech shares for proceeds of $133,337.83.

52.     During the Relevant Period Defendant Kennedy sold 15,000 Mannatech shares for proceeds of $309,509.70.

53.     The Defendants insider stock sales are set forth below:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Samuel L. Caster | 12/21/200 | 180.000 | $2.66 | $ 478.800.00 |
| | | **180,000** | | **$ 478,800.00** |
| Terry L. Persinger | 10/15/200 | 2000 | $18.00 | $36,000.00 |
| | 11/12/200 | 31,000 | $21.8223 | $676,491.00 |
| | 11/15/200 | 10,600 | $20.9798 | $222,385 .00 |
| | 11/17/200 | 50,000 | $2.63 | $131,500 .00 |
| | 11/18/200 | 25,000 | $22.597 | $ 564,925.00 |
| | 11/23/200 | 25,000 | $22.662 | $566,550.00 |
| | 11/29/200 | 36,500 | $23.1488 | $844,931.00 |
| | | **180,100** | | **$2,911,282.00** |
| Fredrick J. Stanley | 10/14/200 | 1000 | $18.45 | $18,450.00 |
| | 10/14/200 | 1000 | $18.253 | $18,253.00 |
| | 10/14/200 | 3547 | $18.25 | $64,732.75 |
| | 10/14/200 | 1200 | $18.28 | $21,936.44 |
| | 10/14/200 | 300 | $18.26 | $5,478.00 |
| | 10/14/200 | 700 | $18.24 | $12,768.00 |
| | 10/14/200 | 10,991 | $18.1 | $198,937.10 |
| | 10/14/200 | 1500 | $18.11 | $27,165.00 |
| | 10/14/200 | 3500 | $18.15 | $63,525.00 |
| | 10/14/200 | 1300 | $18.04 | $23,452.00 |
| | 10/14/200 | 2200 | $18.01 | $39,622.00 |
| | 10/14/200 | 14,362 | $18.00 | $258,516.00 |
| | 10/14/200 | 4200 | $18.03 | $75,726.00 |
| | 10/14/200 | 2500 | $18.05 | $45,125.00 |
| | 10/14/200 | 300 | $18.06 | $5,418.00 |
| | 10/14/200 | 1502 | $17.91 | $26,900.82 |
| | 10/14/200 | 1998 | $17.9 | $35,764.20 |
| | 10/14/200 | 1200 | $17.85 | $21,420.00 |
| | 10/14/200 | 2000 | $17.94 | $35,880.00 |
| | 10/14/200 | 1000 | $17.99 | $17,990.00 |
| | 10/14/200 | 2000 | $18.09 | $36,180.00 |
| | 10/15/200 | 72,725 | $16.7254 | $1,216,354.00 |
| | 10/18/200 | 25,700 | $16.1716 | $415,610.00 |

| | | | |
|---|---:|---|---:|
| | 10/19/200 | 49,700 | $16.1691 | $803,604.00 |
| | 11/12/200 | 17,600 | $21.902 | $385,475.00 |
| | 11/16/200 | 100,327 | $22.0316 | $2,210,364.00 |
| | | **273,652** | | **$3,874,282.31** |
| Gerald E. Gilbert | 4/7/2005 | 3667 | $20.51 | $75,210.00 |
| | 1/11/2005 | 16,667 | $3.49 | $58,167.83 |
| | | **20,334** | | **$133,337.83** |
| Alan D. Kennedy | 10/14/200 | 500 | $19.29 | $9645.00 |
| | 10/14/200 | 400 | $19.28 | $7712.00 |
| | 10/14/200 | 275 | $19.26 | $5296.50 |
| | 10/14/200 | 1825 | $19.25 | $35,131.25 |
| | 10/14/200 | 2000 | $19.4715 | $38,943.00 |
| | 10/14/200 | 2439 | $18.9306 | $46,171.73 |
| | 11/12/200 | 600 | $22.2 | $13,320.00 |
| | 11/12/200 | 100 | $22.18 | $2218.00 |
| | 11/12/200 | 200 | $22.04 | $4408.00 |
| | 11/12/200 | 200 | $22.03 | $4406.00 |
| | 11/12/200 | 300 | $22.01 | $6603.00 |
| | 11/12/200 | 500 | $22.00 | $11,000.00 |
| | 11/12/200 | 261 | $22.02 | $5747.22 |
| | 11/12/200 | 100 | $22.23 | $2223.00 |
| | 11/12/200 | 100 | $22.08 | $2208.00 |
| | 11/12/200 | 100 | $22.09 | $2209.00 |
| | 11/12/200 | 100 | $22.11 | $2211.00 |
| | 11/12/200 | 100 | $22.02 | $2202.00 |
| | 11/12/200 | 4600 | $22.01 | $101,246.00 |
| | 11/12/200 | 300 | $22.03 | $6609.00 |
| | | **15,000** | | **$309,509.70** |

**Total**                     **655,586**                     **$7,707,211.84**

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

54.    Plaintiff brings this action derivatively in the right and for the benefit of Mannatech to redress injuries suffered and to be suffered by Mannatech as a result of the breaches of fiduciary duty by the Individual Defendants.   This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

55.    Plaintiff will adequately and fairly represent the interests of Mannatech and its shareholders in enforcing and prosecuting its rights.

56.    Plaintiff is an owner of Mannatech common stock and was an owner of Mannatech common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

57.    Mannatech's Board of Directors is currently composed of eight (8) directors – Donald A. Buchholz, Samuel L. Caster, J. Stanley Fredrick, Gerald E. Gilbert, Alan D. Kennedy, Terry L. Persinger, Marlin Ray Robbins, Patricia A. Wier, and John S. Axford.    All of the Directors except John S. Axford have been named as Defendants herein.

58.    Defendant Caster has served on the Board of Directors from November 1993 through March 31, 2000 and again from August 2000 to the present.   He served as the Co-Chair of the Board from June 4, 2001 to March 4, 2002, and has been the Chairman of the board since March 5, 2002.   Caster served as Mannatech's President from November 1993 until March 31, 2000.

59.    Defendant Persinger has served on the Board of Directors since November 1999.   He is the Company's President and Chief Operating Officer.   He served as the Executive Vice President from November 1999 to May 2000.

60.    Defendant Buchholz has served on the Board of the Company since October 6, 2004.

61.    Defendant Fredrick has served on the Board of the Company since September 2001.   Since November 2003, he has served as the Lead Director for the Board of Directors.

62.    Defendant Gilbert has served on the Board of the Company since June 2003.

63.     Defendant Kennedy has served on the Board of the Company since June 2002.

64.     Defendant Robbins has served on the Board of the Company since June 2001.

65.     Defendant Wier has served on the Board of the Company since October 2003.

66.     Director John S. Axford has served on the Board of the Company since 2002.

67.     As a result of the facts set forth herein, Plaintiff has not made any demand on Mannatech's Board of Directors to institute this action against the Individual and Director Defendants.   Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the additional following reasons:

a.      Director Defendants Caster and Persinger are considered insiders because of their current and past positions with the Company.   As such, demand on Director Defendants Caster and Persinger is futile;

b.      Pursuant to the Company's 2005 Proxy Statement, Director Defendants Robbins, Caster, Fredrick and Persinger are not Independent.

c.      Defendant Directors Caster and Robbins are co-founders of the Company. Because of their long-standing business and personal relationship, it is reasonable to conclude that Robbins and Caster would not sue each other. As such, demand on Director Defendants Caster and Robbins is futile;

d.      Defendant Directors Caster and Persinger are brothers-in-law.  Because of this family relationship, it is reasonable to conclude that neither Persinger nor Caster would sue each other.   As such, demand on Director Defendants Caster and Persinger is futile;

e.      Defendant Director Caster provided Mannatech with consulting services from June 1, 2000 through March 4, 2002.   As a result of these consulting services, Caster received a total of $1,102,000.  Further, because the Board approved this agreement, it is unlikely that Caster would file suit against any Board member.  As such, demand is futile.

31

f.   Director Defendant Caster is the beneficial owner of 20.2% of Mannatech's common stock. Director Defendant Fredrick is the beneficial owner of 11.7% of Mannatech's common stock. Director Defendant Robbins is the beneficial owner of 7.5% of Mannatech's common stock. Because Defendant Caster owns such a large amount of Company stock, he has de facto control over the members of the Board of Directors to where the members are beholden to Caster for their positions and it is reasonable to conclude that they would not authorize suit against him. Also, because over 39% of the Company's stock is controlled by just three (3) people, all of whom sit on the Board, and the remaining five (5) directors are beholden to these three individuals for their positions, it is reasonable to conclude that the remaining members of the Board would authorize suit against Caster, Robbins and Fredrick. As such, demand in the remaining Board members is futile.

g.   Director Defendant Fredrick has been actively involved for over thirty (30) years in the Direct Selling Association ("DSA"), a national trade association of firms that manufacture and distribute goods and services directly to consumers. He has served on the DSA Board and committees of the Board. From 1987 to 1988, he served has Chairman of the DSA, and on the Direct Selling Association Educational Foundation from 1988 to 1990. He has been inducted in to the DSA's Hall of Fame. From 1968 to 1999, Director Defendant Gilbert served as General Counsel to the DSA, and has been inducted into its Hall of Fame. Not only do Director Defendants Fredrick and Gilbert know each other and developed a close personal and professional relationship at DSA, Director Defendant Kennedy served as Chairman of the DSA from 1995 to 1996, and as Chairman of the Direct Selling Educational Foundation from 1996 to 1997. Kennedy is also a member of the DSA Hall of Fame. Director Defendant Wier was a member of the DSA from 1977 until 1994, and is also in DSA's Hall of Fame. These individuals have developed close personal and professional ties. Because of the length of the personal and professional relationships that developed among Fredrick, Gilbert, Kennedy and Wier through the DSA, it is reasonable to conclude that they would not authorize suit against one another. As such, demand on them is futile;

h.   In June 2003, the Company modified an agreement with Fredrick, to increase annual payments to him to $285,000 because he was performing additional functions for the Company. In November 2003, the Company cancelled this agreement and entered into a Lock-Up Agreement whereby the Company pays Fredrick $185,000 per year for his agreement not to sell his shares. However, in June 2004, the Company's Board of Directors authorized Mr. Fredrick to sell up to 350,000 shares of his stock. Fredrick currently is the owner of Fredrick Consulting Services, which provides consulting services to the direct selling industry. In 2003, Fredrick was a founding board member of Professional Bank in Dallas, Texas, which is a boutique bank that provides certain financial resources to its customers.

i.  In December 2004, Director Defendant Caster entered into an agreement with a former employee whereby Caster agreed to sell 180,000 shares of his common stock at $2.66 per share (the fair market value of the stock at that time was $19.59 per share). As a result, the Company recorded a one-time non-cash charge of $3.0 million.

j.  Director Defendant Caster is the founder of MannaRelief, a 501(c)(3) charitable organization that provides glyconutritional products to under-privileged children. The Company makes cash contributions to MannaRelief and sells products to MannaRelief at cost plus shipping and handling charges, and ships the purchased products to MannaRelief's chosen recipients. For the years ended December 31, 2003 and 2004, the Company sold products to MannaRelief at cost plus shipping and handling of approximately $0.5 and $0.8 million, respectively and made cash contributions of approximately $0.2 million and $0.3 million, respectively. The Company has approved an approximate annual donation of $0.4 million to MannaRelief payable in 2005.

k.  Director Defendant Robbins holds multiple positions in Mannatech's associate global downline network-marketing system. Mannatech pays commissions and incentives to Robbins for product sales and downline growth. In 2004, the Company paid commissions totaling 2.7 million. In 2004, $0.3 million in commissions was paid to Robbins' son and daughter-in-law. Director Defendant Robbins also provides consulting services and travels extensively to speak at functions to promote Mannatech. He is reimbursed for his related expenses.

l.  Director Defendants receive substantial compensation for being on the Board of Directors of Mannatech. Director Defendant Wier and Director Axford received $20,000 in 2004 for being Chairs of the Audit and Science Committees of the Board, respectively. They will make the same fee in 2005. In 2005, Director Defendant Gilbert will receive $7,500 for being the Chair of the Qualified Legal Committee. Additionally, all Directors received a Director Retainer of $30,000 in 2004. In 2005, this retainer is increased to $35,000. In 2004, Director Defendant Fredrick received a $100,000 Lead Director Fee. He will be paid the same fee in 2005. Because of the substantial compensation that these directors received as a result of their position with the Company, it is reasonable to conclude that Wier, Axford, Gilbert and Fredrick would not authorize suit against themselves or other Defendants for fear of losing this income. As such, demand on these directors is futile.

m.  A majority of Mannatech's Board of Directors and senior management participated in the wrongs complained of herein. Mannatech's directors are not disinterested or independent due to the following: Director Defendants served on the Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the Director Defendants breached the fiduciary duties that they owed to Mannatech and

33

its shareholders in that they failed to prevent and correct material misrepresentations made by the Company. Further, the Director Defendants are not independent because of their stake in the financial performance of the Company;

n.      Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

o.      The Director Defendants of Mannatech, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Mannatech's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

p.      In order to bring this suit, a majority of the Directors of Mannatech would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

q.      The acts complained of constitute violations of the fiduciary duties owed by Mannatech's officers and directors and these acts are incapable of ratification;

r.      Any suit by the current directors of Mannatech to remedy these wrongs would likely expose the Individual and Director Defendants, and Mannatech, to additional liability for violations of the securities laws that would result in civil actions being filed against the Individual and Director Defendants. Caster and Persinger are presently Defendants in securities class action lawsuits; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

s.      Mannatech has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Mannatech any part of the damages Mannatech suffered and will suffer thereby;

t.      If the current Directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly

34

increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual and Director Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

u.    If Mannatech's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Mannatech.    However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, it is believed that the directors' and officers' liability insurance policies covering the Individual and Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Mannatech against these Director Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Mannatech, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.    If there is no directors' and officers' liability insurance at all then the current directors will not cause Mannatech to sue them, since they will face a large uninsured liability.

68.    Plaintiff has not made any demand on the shareholders of Mannatech to institute this action since demand would be a futile and useless act for the following reasons:

a.    Mannatech is a publicly held company with approximately 26.99 million shares outstanding, and thousands of shareholders;

b.    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

69.    Mannatech has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.    Such expenditures will include, but are not limited to:

35

a.      Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

b.      Costs and legal fees for defending Mannatech and the Individual Director Defendants against private class action litigation arising from illegal and improper conduct alleged herein.

## FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

70.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

71.     The Individual Defendants owed and owe Mannatech fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Mannatech the highest obligation of good faith, fair dealing, loyalty and due care.

72.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

73.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

74.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Mannatech has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

75.     Plaintiff, on behalf of Mannatech, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

76.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

77.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Mannatech, for which they are legally responsible.

78.     As a direct and proximate result of the Individual Defendants' abuse of control, Mannatech has sustained significant damages.

79.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

80.     Plaintiff, on behalf of Mannatech, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

81.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

82.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Mannatech in a manner consistent with the operations of a publicly held corporation.

37

83.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Mannatech has sustained significant damages in excess of millions of dollars.

84.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

85.   Plaintiff, on behalf of Mannatech, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### for Waste of Corporate Assets

86.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

87.   As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused Mannatech to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

88.   As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

89.   Plaintiff, on behalf of Mannatech, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against The Director Defendants
### for Unjust Enrichment

90.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

38

91.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Mannatech.

92.     Plaintiff, as shareholder and representative of Mannatech, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

### SIXTH CAUSE OF ACTION

**Against The Individual Defendants for**
**Breach of Fiduciary Duties, for Insider Selling**
**and for Misappropriation of Information**

93.     Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

94.     At the time of the stock sales set forth herein by the Individual Defendants, they knew the information described above and sold Mannatech common stock on the basis of such information.

95.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Individual Defendants used for their own benefit when they sold Mannatech common stock.

96.     The Individual Defendants' sale of Mannatech common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

97.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is

39

entitled to the imposition of a constructive trust on any profits the Individual Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding to Mannatech restitution from the Individual and Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

I \Mannatech, Inc\Pleadings\Complaint doc

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 17, 2005

Respectfully Submitted,

William B. Federman, TBA # 00794935
W. Todd Ver Weire, TBA # 24040291
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Phone:  (405) 235-1560
Fax:  (405) 239-2112
*wfederman@aol.com*
*tvw@federmanlaw.com*
- and –
2926 Maple Avenue, Suite 200
Dallas, TX  75201

41

## VERIFICATION

I, _Norma Middleton_____ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Mannatech, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Mannatech, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_10-14-05_____
Date

_Norma Middleton_____

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTION ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFF

NORMA MIDDLETON

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

Terrell, Georgia

## DEFENDANTS

SAMUEL L. CASTER,   TERRY L. PERSINGER, DONALD A. BUCHHOLZ, J. STANLEY FREDRICK, GERALD E. GILBERT, ALAN D. KENNEDY, MARLIN RAY ROBBINS, and PATRICIA A. WIER
COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT – Dallas County, TX
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
WILLIAM B. FEDERMAN, TBA #00794935
W. TODD VER WEIRE, TBA #24040291
FEDERMAN & SHERWOOD
120 N. ROBINSON, SUITE 2720
OKLAHOMA CITY, OK 73102
(405) 235-1560/Fax (405) 239-2112
AND
2926 MAPLE AVENUE, SUITE 200
DALLAS, TX 74201
(214) 696-1100/Fax (214) 740-0112

RECEIVED
OCT 18 2005
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

ATTORNEYS (IF KNOWN)

3-05CV2059-K

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury-Med Malpractice<br>☐ 365 Personal Injury-Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R R & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **FEDERAL TAX SUITS** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 USC 7609 | |
| | | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | | |

## V. ORIGIN   PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 USC §1332(A)(1) STOCHOLDERS' DERIVATIVE ACTION FOR BREACHES OF FIDUCIARY DUTY

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY
DOCKET NUMBER

DATE
10/17/2005
SIGNATURE OF ATTORNEY OF RECORD
W. Todd Ver Weire

FOR OFFICE USE ONLY
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS - 44**